Filed 8/17/16  P. v. Vega CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

LAWRENCE VEGA,

    Defendant and Appellant.

E063398

(Super.Ct.No. FVA1400015)

OPINION

APPEAL from the Superior Court of San Bernardino County.  Ingrid Adamson Uhler, Judge.  Reversed with directions.

Gregory L. Cannon, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Lise S. Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Lawrence Vega of assault by means of force likely to produce great bodily injury and found he personally inflicted great bodily injury after hearing evidence he followed an acquaintance from a New Year's Eve gathering and got into a fight which left the acquaintance with a gash on his neck. The victim testified Vega punched him and then slashed his neck with a boxcutter. Vega testified the victim punched him, and he responded by throwing a punch and lunging at the victim and falling with him onto a fence. Vega contended the victim cut himself on the fence. He denied using a boxcutter and the police did not recover one. The jury hung on the charge Vega committed assault with a deadly weapon and the allegation he personally used a deadly and dangerous weapon.[1]

Vega appeals on the ground his testimony, which some jurors appeared to credit, was substantial evidence he committed the lesser included offenses of assault and battery, and the trial court erred by failing to instruct the jury on those offenses. We agree a simple assault instruction was required, and therefore reverse the judgment and remand to allow the People to accept a reduction of the conviction to assault or retry Vega upon proper instruction.[2]

---

[1] A prior jury failed to reach a verdict on any charges.

[2] Vega also contends that prosecutorial misconduct requires reversal and that we should correct errors in a minute order and the abstract of judgment. Because we reverse on the instructional error, we do not reach those issues.

# I

## FACTUAL BACKGROUND

The District Attorney of San Bernardino County filed an information charging Vega with assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1); count 1) and assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4); count 2).[3] With respect to both counts, the information alleged Vega personally inflicted great bodily injury upon the victim within the meaning of section 12022.7, subdivision (a). With respect to count two, the information alleged Vega personally used a deadly and dangerous weapon within the meaning of section 12022, subdivision (b)(1). The information also alleged Vega had suffered two serious and violent felony convictions (strikes) within the meaning of sections 667, subdivisions (b) through (i) and 1170.12, subdivisions (a) through (d), and had suffered five prison prior convictions within the meaning of section 667.5, subdivision (b).

The charges arose from events on the evening of December 31, 2013, during and after two small New Year's gatherings at Vega's garage and the apartment of a neighbor. Vega and the victim, Donald Morgan, attended the gatherings with a few other people. After Morgan left, Vega followed him, and the two got into a fight near Morgan's home which left Morgan with a gash on his neck. The jury heard conflicting testimony about the events from Morgan and Vega. Officer Steven Roe testified about the police

---

[3] Unlabeled statutory citations refer to the Penal Code.

3

investigation.  This appeal primarily concerns the nature of the fight between Morgan and Vega, so we do not recount in detail the testimony of witnesses about the events that led to it, except to note inconsistencies with the testimony of the principals.

A. *The Victim's Testimony*

Morgan said he arrived at a New Year's Eve party at Vega's home at around 8:00 p.m., December 31, 2013.  Besides Vega and himself, he said two other people attended the party—Stephanie and Vera.  Morgan said it was a friendly gathering.  Everyone was drinking beer and "talking about, you know, the daily things.  You know, New Year[']s Eve, you kinda just talk about, you know, things that are going on in the house and things that are going on outside."  He said no one became unfriendly, there were no arguments, and no fights.  He said he left Vega's home at about 10:00 p.m. and started to walk home, about three or four minutes away.[4]  He said nothing precipitated his leaving, he "just wanted to go home."

Morgan's testimony about the New Year's Eve gathering differs from the testimony of Vega and other witnesses who attended the party.  Everyone else testified the party-goers moved from Vega's home across the street to Vera's home before Morgan left for home.  Vera and Vega testified Morgan and Vega were involved in some sort of conflict during the party.  Vera said Vega was "starting to become belligerent,"

---

[4]  Morgan appears to have been mistaken about the times he reported arriving at and leaving the party.  He later agreed he spoke to the police at 8:00 p.m., and law enforcement testified the 911 operator received Morgan's call reporting the attack at 8:20 p.m., both after he left the party.

4

which is why they decided to move to her place. She said Vega came over to her house and "was kind of like being a bully towards [Morgan]," "using foul language towards him" and trying to get Morgan to buy more beer. Vega testified he was "clowning around" with Morgan, making fun of him for having a male roommate.

At some point, Morgan left the gathering, whether from Vega's home or Vera's. Morgan said he was walking down the middle of the street about one car length from his home when Vega accosted him. "I turned and I saw him. I said, 'Larry, what are you going to do?' and he just sucker punched me" on the left side of the chin. He said Vega then "pulled out a knife," which he described as a red boxcutter, "and cut me" in the neck below the left ear. Asked whether he fought back, he said, "It happened so quick and I don't fight." Morgan also said no one else was around to see the incident.

Morgan said he "was stunned. I just went over and sat down on the steps at my—my house." Immediately after the assault, Vega left and Morgan called 911. Morgan said his roommate got him a towel for his wound and there was a substantial amount of blood. Paramedics took Morgan to the hospital, where he received 14 stitches. At the time of trial, Morgan had a two to two and a half-inch scar, which he showed to the jury.

B. *Law Enforcement Testimony*

Officer Steven Roe responded to the scene for the Fontana Police Department. When he arrived, he "observed an ambulance and [Morgan] sitting inside the ambulance." Officer Roe saw Morgan and took some photographs, but the evidence about the injury is of limited value. Officer Roe said Morgan had "a blood-soaked

5

bandage on the left side of his neck." Asked whether he had the opportunity to view the injury in its entirety, he responded, "I believe I tried to peel back the bandage, but I didn't want to disturb the injury and further injure him." Officer Roe said the injury was a "fairly deep," "5 to 6-inch laceration" "located on the left side of his neck," which produced a lot of blood. He said, "the blood stream soaked through the gauze and came onto his shirt and neck." The prosecution introduced Officer Roe's photographs as exhibits, and they are broadly consistent with his testimony. One photograph shows the edge of a gash on the left side of Morgan's neck, but the injury is mostly obscured by gauze. The gauze had absorbed a significant amount of blood and a small amount of blood had run onto Morgan's shirtfront. Officer Roe did not testify whether the gash was smooth or jagged. Nor did the prosecution present medical records about the injury or testimony by Morgan's treating physician or a medical expert. Officer Roe said he saw no other scratches, cuts, or abrasions on Morgan's face or body.

Officer Roe spoke to Morgan at the scene. He reported, "Mr. Morgan stated he was cut on the left side of his neck with a boxcutter by Mr. Vega." He said, "in the recording of my statement it stated that he was punched and then cut, but later I confirmed the statement with him and asked 'So you were cut then punched?' and he said 'Yes.' So there was kind of a conflicting statement" on whether Vega hit or cut Morgan first. Police arrested Vega based on Morgan's description, and Morgan personally identified Vega as his attacker. Officer Roe said several officers canvassed the

6

neighborhood, but they did not locate a boxcutter. Nor did they find anyone who witnessed the event, other than the participants.

C. *Vega's Testimony*

Vega told a very different story. Vega said he was cleaning his garage when some friends stopped by with some beer. Morgan came a little later and also brought beer. Vega said, "I wasn't planning on nothing, but then we started drinking and then, um, you know, just—then we moved across the street to [a neighbor's]" house when it got dark. At the neighbor's house, Vega said, "we were clowning around and then Don got mad at me." Vega said he was making fun of Morgan because he has a male roommate—asking things like "Who's the man in the house?" According to Vega, Morgan asked to talk to him and the two left the gathering and started walking down the street.

Vega reported Morgan "was mad because of the clowning around. They were laughing at him. We were joking. I didn't take him serious. But we kept walking and when we walked out to the street, he kept on—we kept on walking and when he turned around like by the curb—we got up on the curb—he turned around and took a swing at me." Vega said Morgan then tried to throw a stick at him, "and I swung at him, but when I swung, I threw my body and we just went back. That's when we hit the fence. He fell down and I—I fell on top of him. Then we jumped up and that's when I thought he grabbed, like, right here [indicating the right side of the neck] and he goes 'I'm bleeding.'" Vega said the fight ended immediately. "He jumped up. I jumped up. He went towards his house. I went towards mine." Vega did not say how far the fence was

7

from where he hit Morgan, however, Morgan said the fence was about six feet away. Vega denied using a boxcutter. Morgan denied falling on the fence.

D. *Jury Instructions*

The trial court instructed the jury that to prove Vega guilty of assault with force likely to produce great bodily injury (§ 245, subd. (a)(4)), "the People must prove that: [¶] 1. The defendant did an act that by its nature would directly and probably result in the application of force to a person and the force used was likely to produce great bodily injury; [¶] 2. The defendant did the act willfully; [¶] 3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; [¶] 4. When the defendant acted, he had the present ability to apply force likely to produce great bodily injury; and [¶] 5. The defendant did not act in self-defense." The trial court further instructed that "Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm."

The trial court did not instruct the jury on simple assault or battery. After hearing Morgan testify and before Vega had decided whether he would testify, the trial court indicated it believed an assault instruction was appropriate because, "let's say hypothetically [the jury] believe[s] Mr. Morgan, that he was sucker punched, and then based on the force of the sucker punch, he landed into the chain-link fence and that caused the gash to his throat, then at most he'd be found guilty of simple assault, right?" The trial court said, "I think [out of] an abundance of caution we should give the lesser-

8

included offense of simple assault." Defense counsel agreed and requested the instruction. The prosecutor objected.

The trial court asked whether the prosecutor was "going to argue in the alternative that the blow to the face . . . caused him to go into the chain-link fence, so he's still guilty of the [section] 245 (a) (4)" offense. The prosecutor said, "I don't think I'll make that argument." The trial court said, "if you aren't going to make that argument, I think I should still give simple assault." The trial court said, "I'll indicate for the record I did not give simple assault the first time," and the prosecutor agreed. The jury failed to return a verdict in the first trial. The court then said, "I'm thinking in my mind if [the jurors] separate out the two acts, that maybe it would be just a simple assault" and as a result "I have a sua sponte obligation to give simple assault."

Later, after Vega decided to testify, but before he had presented his version of the events, the trial court decided a simple assault instruction was not required. The court said, "When I just focus on the defendant's actions to the victim, if obviously the jurors believe the victim's rendition, then there would be no substantial evidence to support any lesser-included offenses. It's kind of an all[-]or[-]nothing approach. [¶] In regards to the blow to the face, obviously that is independent of what happened in terms of the boxcutter slash to the neck. . . . [I]f the jurors accept the victim's rendition, then he's guilty. If they disbelieve the victim's rendition, then he's not guilty. And I don't believe there's any substantial evidence to support any lesser-included offenses, so I will not be giving those as to the charged offenses."

9

As we have discussed, Vega later testified he punched Morgan, lunged at him, and the two fell onto a chain-link fence. The trial court did not revisit the lesser included offense instruction after hearing that testimony and defense counsel did not renew his request for the instruction. Neither the trial court nor the parties raised giving the jury a battery instruction.

E. *Verdict and Sentencing*

The jury failed to reach a verdict on the allegation Vega used a boxcutter to slash Morgan's neck. During deliberations, the jury requested a transcript of Morgan's testimony, "describing how he was cut & what was used, what he saw," and the court reporter read Morgan's testimony to the jury. The jury split eight to four on the charge he assaulted Morgan with a deadly weapon and on the allegation that he employed a deadly weapon in committing assault by means of force likely to cause great bodily harm. The record does not disclose whether the eight jurors supported a verdict of guilty or not guilty. The trial court declared a mistrial on the assault with a deadly weapon count. However, the jury found Vega guilty of assault by means of force likely to cause great bodily injury and found Vega had personally inflicted great bodily injury.

On January 23, 2015, the trial court found Vega had sustained two prior strike convictions (§ 667, subds. (b)-(i))—a 1984 conviction for attempted second degree robbery and a 1990 conviction for second degree robbery. The court also found he had suffered five prior prison term convictions (§ 667.5, subd. (b))—the two strikes and three other convictions. Because assault by means of force likely to cause great bodily injury

10

is a strike offense, the trial court imposed a Three Strikes sentence of 25 years to life on count 2. The court imposed three consecutive years for the great bodily injury enhancement, and two consecutive years for two of the prison priors. The trial court reduced one prison prior (for drug possession) to a misdemeanor under section 1170.18, subdivision (a) and struck the sentences on the prison priors that qualified as strikes.

## II

## DISCUSSION

Vega contends the trial court committed prejudicial error by failing to instruct on the offenses of assault and battery, which he claims are lesser included offenses. We agree the court erred by not giving the simple assault instruction.

We review de novo the trial court's failure to instruct the jury on a supposedly lesser included offense. (*People v. Licas* (2007) 41 Cal.4th 362, 366.) "'[A] lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser. [Citations.]' [Citation.]" (*Ibid.*) It is well established that simple assault is a lesser included offense of assault by means of force likely to produce great bodily injury (*People v. Yeats* (1977) 66 Cal.App.3d 874, 879) and also that battery is not. (*People v. Corning* (1983) 146 Cal.App.3d 83, 90 ["Since aggravated assault may also be committed without the actual use of force or violence necessary for felony battery, felony battery is not a lesser included offense of aggravated assault"].)

11

A trial court must instruct concerning all lesser included offenses which find substantial support in the evidence. (*People. v. Barton* (1995) 12 Cal.4th 186, 194-195.) Substantial support is evidence a reasonable jury could find persuasive, which, if accepted, would absolve defendant of guilt on the greater offense, but not on the lesser. (*People v. Licas*, *supra*, 41 Cal.4th at p. 366.)

The trial court must instruct on lesser included offenses supported by substantial evidence in all circumstances, even when a party, for tactical reasons, seeks to present the jury with an all-or-nothing choice between the offense charged and acquittal. (*People v. Banks* (2014) 59 Cal.4th 1113, 1159-1160, abrogated on other grounds by *People v. Scott* (2015) 61 Cal.4th 363, 386.) "The state has no interest in a defendant obtaining an acquittal where he is innocent of the primary offense charged but guilty of a necessarily included offense. Nor has the state any legitimate interest in obtaining a conviction of the offense charged where the jury entertains a reasonable doubt of guilt of the charged offense but returns a verdict of guilty of that offense solely because the jury is unwilling to acquit where it is satisfied that the defendant has been guilty of wrongful conduct constituting a necessarily included offense. Likewise, a defendant has no legitimate interest in compelling the jury to adopt an all or nothing approach to the issue of guilt. Our courts are not gambling halls but forums for the discovery of truth." (*People v. St. Martin* (1970) 1 Cal.3d 524, 533.)

The use of hands or fists may support a conviction of assault by means of force likely to produce great bodily injury. (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028.)

12

Whether such force "would be likely to cause great bodily injury is to be determined by the force of the impact, the manner in which it was used and the circumstances under which the force was applied." (*People v. McDaniel*, 159 Cal.App.4th 736, 748-749.) The results of an assault are not conclusive, but are highly probative of the amount of force used. (*Id.* at p. 748.) Though actual injury is not required for a conviction, if an injury results, the extent and location of the injury are relevant facts. (*People v. Beasley* (2003) 105 Cal.App.4th 1078, 1086.) It is the jury's role to determine whether the evidence supports a finding that an attack was carried out in a manner likely to cause great bodily injury. (*People v. Armstrong* (1992) 8 Cal.App.4th 1060, 1066.)

Here, the court did not instruct the jury on the elements of simple assault, and the jury convicted Vega of assault by means of force likely to produce great bodily injury. Thus, the question we face is whether there is substantial evidence from which a reasonable jury could find the force Vega used in assaulting Morgan was less than force likely to produce great bodily injury.

Vega's version of the events supplies the evidence from which the jury could have concluded the attack was simple assault. According to Vega, he "swung at [Morgan], but when I swung, I threw my body and we just went back. That's when he hit the fence. He fell down and I—I fell on top of him." As it happens, according to Vega's version, Morgan fell into a chain-link fence and sustained a gash to his neck. After the fall, according to Vega, "we jumped up and that's when I thought he grabbed, like, right here [indicating the right side of his neck] and he goes 'I'm bleeding.'"

13

The injury caused Morgan to lose a considerable amount of blood and required him to be taken to a hospital, where he received 14 stitches. At the time of his testimony at trial, Morgan had a two to two and a half-inch scar. Otherwise, the evidence concerning Morgan's injury was limited. Officer Roe said the injury was bandaged when he arrived. The prosecutor did not put on clear photographic evidence, testimony by a treating physician or medical expert, or otherwise introduce Morgan's medical records. We conclude that, despite the apparent seriousness of the injury, a reasonable jury could have concluded from this evidence that Vega was guilty of simple assault by finding the force he used was not likely to produce such an injury.

Our conclusion is based on cases that involved similar attacks. For example, in *People v. Rupert* (1971) 20 Cal.App.3d 961, 968, the Court of Appeal determined evidence of a similar attack required an instruction on simple assault. In *Rupert*, the victim testified she had attempted to intercede in an attack on her mother when "defendant struck her at least five times, knocking her to the floor." (*Id.* at p. 966.) The evidence was not clear whether the defendant struck the victim with his hands alone or also used a coffee pot. (*Id.* at p. 968) As a result of the attack, the victim "sustained several cuts and a concussion, and at the trial she had a scar on her left cheek." (*Id.* at p. 966.) The Court of Appeal recognized assault under section 245 "may be committed by means of the hand or fist alone," and "[t]he extent of the injury" and "the nature of the assault, are questions of fact for the jury to determine." (*Id.* at pp. 967-968.) The court concluded the jury might reasonably have found defendant did not use force likely to

produce great bodily injury, despite the fact he knocked the victim to the ground and despite her injuries, and held "[i]f the jury so concluded, a verdict of guilty of simple assault would have been proper." (*Id.* at p. 968.) The court therefore reversed the conviction on the basis that the trial court failed to instruct on the lesser included offense. (*Id.* at p. 969.)

*People v. Clark* (2011) 201 Cal.App.4th 235 is also instructive. *Clark* involved a physical altercation between a father (the defendant) and his wife and their 14-year-old son. The defendant was chasing his wife outside when the son attempted to intervene. "The son caught defendant near the outside steps. He could not jump on defendant's back because defendant was 'too tall.' Instead, the son pushed and tried to hit defendant. Defendant slapped his son, pushed him away and continued to chase after wife. The son caught up with defendant again. Defendant tripped his son, causing the son to fall on the ground onto his back. [¶] . . . [D]efendant [then] got on top of his son and slapped him on the sides of his head with open palms." (*Id.* at pp. 240-241.) The son "sustained 'cuts' and a 'gash' on his mid and lower back" and "superficial abrasions in the area of these injuries." (*Id.* at p. 241.) The defendant was charged with assault with force likely to cause great bodily injury for the attack on his son, but the trial court instructed the jury on the offense of simple assault as a lesser included offense. (*Ibid.*) The jury found the defendant not guilty of assault by means of force likely to cause great bodily injury, but guilty of simple assault. (*Id.* at p. 238.)

15

There is substantial evidence in this case that Vega carried out an attack using a similar degree of force. The jury evidently rejected Morgan's claim that Vega used a boxcutter in the attack. It also appears to have accepted some version of Vega's account. From Vega's testimony the jury reasonably could have found the force he used against Morgan was not likely to produce great bodily injury. As in *Rupert* and *Clark*, Vega attacked his victim with enough force to knock him to the ground. Like the victim in *Rupert*, Morgan suffered a gash that left a scar. And like the victim in *Clark*, evidence supports the conclusion he suffered a gash from the fall rather than from the blow. Though the evidence in all three cases was sufficient to support a jury's verdict that the defendants had used force likely to cause great bodily injury, the evidence did not compel that finding.

On the contrary, as the court held in *Rupert*, the jury might have found defendant guilty of simple assault. In *Clark*, the jury, when correctly instructed, *did* find defendant guilty of simple assault on similar evidence. In this case, the jury might have found, based on the limited description of the events put forward by Morgan and Vega, that the assault was a garden variety fistic encounter that ended badly because the victim unexpectedly landed on a piece of metal protruding from a chain-link fence. "'[W]here the blows are serious, but still leave a question of fact as to the character of the force used, the defendant is entitled to an instruction on the included offense of simple assault.'" (*People. v. Sargent* (1999) 19 Cal.4th 1206, 1222, quoting 1 Witkin Epstein, Cal. Criminal Law (2d ed. 1988) Crimes Against the Person, § 419, p. 481.) By failing to

16

instruct the jury on simple assault, the trial court improperly deprived the jury of the ability to reach such a verdict. (*People v. Breverman* (1998) 19 Cal.4th 142, 154-155; *People v. Richardson* (1972) 23 Cal.App.3d 403, 409 ["[T]he verdicts as rendered could be sustained if the jury had been instructed properly. But since the jury was not allowed a choice of convicting of lesser assaults . . . the judgment must be reversed"].)

The fact Morgan suffered a gash that produced a significant amount of blood does not require a different result. The jury convicted Vega of assault by means of force *likely* to cause great bodily injury. Thus, the focus of our inquiry is Vega's conduct and the risk it created. And while the nature of the injury is probative of the degree of force used, it is not dispositive. (*McDaniel*, *supra*, 159 Cal.App.4th at pp. 748-749.) Here, the evidence supports a finding that Vega punched and pushed Morgan with sufficient force to knock him to the ground. Such force plainly creates the risk of injury. Morgan could have hit his head on concrete or a stone, for example. The defendants in *Rupert* and *Clark* used a similar degree of force, as each knocked his victim to the ground and each victim suffered a gash. The evidence in this case supports a jury finding that the victim just so happened to fall so as to slash his neck on a piece of exposed metal. The jury could reasonably have found that such an injury was outside the scope of the risk of knocking a person to the ground.

As we have noted, however, the evidence concerning Morgan's injury was not well developed. It shows only that Morgan suffered a gash that produced a lot of blood and required stitches. But no one who inspected the injury testified. Officer Roe

17

observed the injury after it was bandaged and did not remove the bandage to see its extent. The photographs he took are inconclusive because, as he testified, the injury is obscured by gauze. The prosecution did not present testimony by anyone who treated Morgan, did not introduce medical records describing the injury, or even proffer a medical expert who had viewed photographs of the injury. In addition, Officer Roe testified he did not see any other scratches, cuts, or abrasions on Morgan's face or body that might have indicated Vega used substantial force in punching and pushing him. More detailed evidence of the nature of the injury and the fight may have helped distinguish whether Vega used substantial force in knocking Morgan down or whether the fall was the result of the two men stumbling. On this limited record, we cannot say the injury was so serious as to *require* the jury to find Vega used force likely to cause great bodily injury.

In a noncapital case, we evaluate the trial court's failure to instruct on lesser included offenses that are supported by the evidence for prejudice under *Watson*;[5] we reverse only if it is reasonably probable the defendant would have obtained a more favorable result had the error not occurred. (*People v. Breverman*, *supra*, 19 Cal.4th at p. 178.)

On this record, we cannot say the trial court's failure to instruct on simple assault was not prejudicial under the *Watson* standard. The prosecution's case was not overwhelming. A first jury failed to reach a verdict on the same charges. The second

---

[5] *People v. Watson* (1956) 46 Cal.2d 818, 836-837.

18

jury failed to reach a verdict on allegations that Vega used a deadly weapon in committing the assault. The second jury evidently gave Morgan's testimony careful consideration, because it had his testimony "describing how he was cut & what was used, what he saw" read back by the court reporter during deliberations. But, in the end, several members of the jury rejected Morgan's testimony that Vega assaulted him with a boxcutter. The jury may have discounted his testimony because he had credibility problems. As defense counsel established, Morgan's testimony about the time of the incident and the events precipitating it were inconsistent with the testimony of the other witnesses.

Meanwhile, Vega's statements about the incident were not subject to the same problems. Vega conceded he got into a physical altercation with Morgan and conceded Morgan was injured as a result. The jury obviously found Vega struck Morgan with his fist, but it was not given the option of finding the manner of the attack supported a finding of simple assault. Based on the problems with Morgan's testimony, the limited evidence concerning the injury, and the jury's seeming acceptance of Vega's testimony that he punched Morgan and fell with him onto a chain-link fence, we find it reasonably probable the jury would have returned a result more favorable to Vega under proper instruction. We therefore conclude the trial court's failure to instruct on simple assault was prejudicial.

# III

## DISPOSITION

We reverse the judgment and remand the matter to allow the People to accept a reduction of the conviction to assault or retry Vega upon proper instruction. If the People accept a reduction, the trial court shall enter judgment against Vega for assault and sentence him accordingly.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH
J.

We concur:

McKINSTER
Acting P. J.

MILLER
J.